**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**ELIZABETH M. ORR**                                                        **PLAINTIFF**

**V.**                               **CASE NO. 5:15-CV-05098**

**CITY OF ROGERS**                                                      **DEFENDANT**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Currently before the Court is a Motion for Summary Judgment (Doc. 21) filed by the Defendant, City of Rogers (the "City"), on September 12, 2016. Plaintiff Elizabeth Orr filed her Response (Doc. 36) on October 31, 2016, and the City filed a Reply (Doc. 38) a week later. On January 24, 2016, the Court held a hearing on the Motion, during which it took oral argument from both parties. The City's Motion is now ripe for adjudication. For the reasons discussed below, the Motion (Doc. 21) is **GRANTED IN PART AND DENIED IN PART**.

### I. BACKGROUND

The facts of this case are recited herein in the light most favorable to Orr, the non-moving party, and are limited only to what is necessary to provide context for the Court's decision. Elizabeth Orr is a 59-year-old female who was employed by the City from February of 2004 until her termination in May of 2014. Orr began her employment as a dispatcher for the City's emergency services, and was eventually promoted to the position of Telecommunicator Supervisor in December of 2009. This supervisory position required her to oversee several dispatchers, and also to continue operating as a dispatcher herself.

In February of 2013, Orr broke her dominant left arm. This injury kept her out of work from February 19, 2013 to April 2, 2013, when she returned and was placed on light

1

duty. Her job responsibilities while on light duty consisted of administrative work, and did not involve working as a dispatcher. During this time, Orr's arm was in a sling and she was still undergoing physical rehabilitation. In September of 2013, Orr's doctor recommended that she have surgery on her arm because her injury was not healing properly. She underwent surgery on October 24, 2013, and remained out of work until November 11, 2013. Upon returning, her arm remained impaired and she was assigned to a light duty position until January or February of 2014. At that point, she was physically able to perform her regular duties, and returned to them accordingly. *See* Doc. 23-1, pp. 21-22.

On several occasions after Orr returned to her full job duties, she allegedly requested additional training to "get her up to speed." (Doc. 35-2, ¶ 6). More specifically, Orr requested training on certain software upgrades and unwritten protocol changes that occurred while she was out of work or on light duty. These requests, according to Orr, fell upon deaf ears, and the City did not provide her with the training she needed. Instead, it offered her only "generic trainings"—trainings on issues of basic dispatcher competency not specific to the City's software and protocols. *Id.* at ¶ 14.

From March 13, 2014 to May 9, 2014, Orr was involved in seven specific incidents that the City eventually cited in its May 19, 2014 termination letter to her. On March 13, 2014, Orr was the original call-taker on a 9-1-1 call from the address of 1112 South E Street. The termination letter states that she "failed to ask key questions about the nature of the call," and "failed to log key information" regarding the call. (Doc. 23-8, p. 3). On March 25, 2014, Orr took a call from 1761 S. 1st Street and "failed to accurately log information . . . which resulted in the dispatcher not being able to provide responding

officers[] details about the weapons involved." *Id.* On April 22, 2014, again per the termination letter, Orr failed to notify her shift personnel about a train derailment, even though she was aware of the derailment. *Id.* On April 23, 2014, Orr's supervisor, Vicki Atchley, discovered that Orr did not properly supervise a dispatcher who was having difficulty coding fire dispatches. The termination letter indicates that Orr did not follow-up with the dispatcher after she put him into remedial fire training. Orr also varied from the Police Department's quality assurance procedures by failing to review 58 calls with him. *Id.* at 3-4. On April 28, 2014, the termination letter indicates that Orr failed to "give all possible returns on a Legislative Tag run by an officer." *Id.* at 4. On May 1, 2014, Orr processed a call where the caller twice gave a location of the intersection of North 24th Street and Meadow Lane. Orr recorded the location as being the intersection of North 24th Street and Meadow Drive, which is an entirely different location. *Id.* Finally, on May 9, 2014, Orr was the call-taker on a house fire at 4113 Willowbend Drive. Orr entered the call as being from 404 E. Willow Street, causing fire department personnel to be dispatched to that address. *Id.*

On May 14, 2014, the City provided Orr with written notice that the Rogers Police Department was considering disciplinary action against her, and was placing her on paid administrative leave. (Doc. 44-1). She attended a pre-disciplinary hearing two days later. On May 19, 2014, Rogers Chief of Police James Allen sent the aforementioned termination letter to Orr. The letter indicates that Orr's actions violated the City's Code of Conduct provision related to maintaining sufficient competency to perform duties.

Orr does not present facts that undermine the occurrence of these incidents, but does dispute whether they were terminable offenses, and whether she was even at fault

for them. For example, she contends that the calls where she entered the incorrect addresses were the result of a computer "bug" with the reporting software. Some of her supposed errors, she contends, derived from being overworked. And, as noted above, she asserts that she requested, but was denied, additional training on the software used to log emergency calls after she returned to work from her arm injury. Moreover, she argues that these infractions were similar in kind to infractions committed by several other employees whom the City did not terminate.

Accordingly, Orr initiated a lawsuit in this Court on April 28, 2015, and filed an Amended Complaint (Doc. 13) on November 20, 2015. The Amended Complaint alleges sex discrimination in violation of Title VII and the Arkansas Civil Rights Act ("ACRA"); disability discrimination in violation of the ADA, the ACRA, and the Rehabilitation Act; retaliation under the Family and Medical Leave Act ("FMLA"), the ACRA, and the Rehabilitation Act; and age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"). The City's Answer (Doc. 15) generally denies these claims. On September 12, 2016, the City filed the instant Motion for Summary Judgment (Doc. 21). The Motion first argues that all of Orr's claims are time-barred because her Amended Complaint cannot relate back to her Original Complaint (Doc. 1). Alternatively, the Motion asserts that no material facts are in dispute and Orr has failed to prove any of her claims. That Motion is now ripe, and for the reasons stated below, is **GRANTED IN PART AND DENIED IN PART**.

## II. SUMMARY JUDGMENT LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

4

of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the non-moving party, and give the non-moving party the benefit of any logical inferences that can be drawn from the facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). The moving party bears the burden of proving the absence of any material factual disputes. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). If the moving party meets this burden, then the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). These facts must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986)).

### III. DISCUSSION

The Court begins by addressing two preliminary matters raised by the City's Motion and Orr's Response. First, Orr concedes in her Response (Doc. 36) that the City is entitled to summary judgment on her ADEA and FMLA claims. The Court therefore **GRANTS** the City's Motion for Summary Judgment (Doc. 21) as to those issues. Second, the Court disagrees with the City's assertion that Orr's claims are time barred. Orr filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January

19, 2015, and received a Right to Sue Letter on January 30, 2015. *See* Docs. 1-1; 1-2; 1, ¶ 3. She filed her *pro se* Original Complaint on April 28, 2015, just within the 90-day time period allotted by Title VII, the ADA, the Rehabilitation Act, and the ACRA. *See* 42 U.S.C. § 2000e-5(f)(1); 42 U.S.C. § 12117; 29 U.S.C. § 794a(a)(1); Ark. Code Ann. § 16-123-107(c)(3). After obtaining counsel, Orr filed an Amended Complaint on November 20, 2015. (Doc. 13). According to the City, the allegations in Orr's Amended Complaint "are too temporally, and substantively dissimilar, to those contained in [her] original Complaint, to allow them to be related back to the earlier pleading." *McKenzie v. Lunds, Inc.*, 63 F. Supp. 2d 986, 999 (D. Minn. 1999). Because the Amended Complaint cannot relate back to the date of the Original Complaint, the argument continues, it falls outside of the 90-day statutory time limitation.

Federal Rule of Civil Procedure 15(c) provides, in relevant part, that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." The face of Orr's Original Complaint provided the City with notice: (i) that she filed a charge with the EEOC based on "sex, age, and disability" discrimination; (ii) that the discrimination occurred "by disciplining her more harshly than male employees" and younger female employees, and "by failing to provide her with the same training" received by others; and (iii) that her termination was also discriminatory. *See* Doc. 1. In addition, the Complaint attaches her EEOC Charge, (Doc. 1-1), which discusses her denied request for remedial training, disciplinary history, and allegations of disability, age, and sex discrimination. Given that the scope of her Amended Complaint, after conceding the issues of age and

FMLA discrimination, involves sex and disability discrimination based on her termination and training request, her Amended Complaint clearly arises "out of the conduct, transaction, or occurrence" set out in the original pleading. Fed. R. Civ. P. 15(c). Orr's Amended Complaint, therefore, relates back to the date of her Original Complaint, and is not time barred.

The primary case relied on by the City, *McKenzie*, 63 F. Supp. 2d at 986, is not to the contrary. There, the District of Minnesota court found that an amended complaint did not relate back to an original complaint after the original complaint simply alleged Title VII discrimination without specifying the basis of the discrimination, and the amended complaint asserted an ADEA claim. *Id.* at 998-1000. The amended complaint also asserted a series of discriminatory acts that were not mentioned in the original complaint. *Id.* at 998. This made the disparity between the original and amended complaints so significant that "the conduct alleged in the Plaintiff's initial Complaint cannot be said to have arisen out of the same set of facts as asserted in his amended claim," under Rule 15(c). *Id.* at 999. Unlike in *McKenzie*, Orr's Original Complaint and its attachments specifically identify the claims of age and disability discrimination that have persisted through her Amended Complaint, as well as the events from which those allegations of discrimination stem. By receiving the Original Complaint, then, the City should have "understood what the factual basis for those claims were originally purported to be." *Id.* at 1000.

These preliminary matters having been decided, the Court will proceed by setting forth the ADA and Title VII legal principles applicable to this case, and then discussing how these principles apply to Orr's claims.

**A. ADA and Title VII Principles of Law**

"The ADA makes it unlawful for a covered employer to discriminate against any 'qualified individual on the basis of disability.'" *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013) (quoting the ADA, 42 U.S.C. § 12112(a)).[1] Discrimination under the ADA includes, in relevant part, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5). And, the ADA prevents employers from retaliating against persons who invoke the Act's protections. 42 U.S.C. § 12203(a). A plaintiff thus can bring claims under the ADA for failure to accommodate, retaliation, and other forms of disparate treatment.

Under the familiar framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff alleging disparate treatment or retaliation under the ADA must first establish a *prima facie* case of discrimination. *See Olsen v. Capital Region Med. Ctr.*, 713 F.3d 1149, 1153 (8th Cir. 2013). To establish a *prima facie* case of disparate treatment, a plaintiff must show that she: "(1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment action because of [her] disability." *E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 969 (8th Cir. 2014) (quotation omitted). To establish a *prima face* case of retaliation, a plaintiff must show that "(1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against her, and (3) there was a causal connection between the adverse

---

[1] Rehabilitation Act and ACRA claims are evaluated using the same standards applied under the ADA. *See* 29 U.S.C. § 794(d); *Perkins v. St. Louis Cnty. Water Co.*, 160 F.3d 446, 448 (8th Cir. 1998) (noting that "the legal principles applicable to [the ADA] are equally applicable to [the] Rehabilitation Act"); *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 490 (8th Cir. 2002) ("[W]e analyze a disability claim presented under the ACRA using the same principles employed in analyzing claims under the [ADA].").

action and the protected activity." *Hill*, 737 F.3d at 1218. "Once the plaintiff establishes this prima facie case, then a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action." *Prod. Fabricators*, 763 F.3d at 969. "If such reason is provided, the burden shifts back to the plaintiff to show that the employer's proffered reason is merely a pretext for intentional discrimination." *Id.*

A plaintiff alleging a failure-to-accommodate violation of the ADA need not engage with the *McDonnell Douglas* framework. "This is so because a claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive. The *McDonnell Douglas* line of cases, however, is aimed at fleshing out this elusive factual question of intentional discrimination." *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004) (quotation omitted). Instead, the Eighth Circuit has prescribed "a modified burden-shifting analysis," *Fenney v. Dakota, Minn. & Eastern R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003), in which a plaintiff "must establish both a prima facie case of discrimination based on disability and a failure to accommodate it," *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015). The plaintiff then has the burden to show "that the requested accommodation is 'reasonable on its face, *i.e.,* ordinarily or in the run of cases.'" *Peebles*, 354 F.3d at 768 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)). "Upon such a showing, the employer is left to 'show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.'" *Id.* (quoting *Barnett*, 535 U.S. at 402).

The Eighth Circuit has also recognized that the ADA creates "a shared responsibility between employers and employees to resolve accommodation requests," *E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 795 (8th Cir. 2007), commonly referred to as the "interactive process," *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 902 (8th Cir. 2009). A plaintiff can demonstrate that her employer failed to engage in this interactive process by showing that:

> 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Prod. Fabricators*, 763 F.3d at 971. "Although there is no per se liability under the ADA if an employer fails to engage in an interactive process," *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1021 (8th Cir. 2000), for summary judgment purposes, "the failure of an employer to engage in an interactive process . . . is prima facie evidence that the employer may be acting in bad faith," *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 (8th Cir. 1999). "Under these circumstances . . . a factual question exists as to whether the employer has attempted to provide reasonable accommodation as required by the ADA." *Id.*

Finally, Title VII of the Civil Rights Act of 1964 makes it unlawful for employers to discriminate on the basis of race, sex, color, national origin, or religion. *See* 42 U.S.C. § 2000e-2(a).[2] A claim of discrimination survives summary judgment if the plaintiff produces direct evidence of discrimination, or creates an inference of discrimination under

---

[2] Title VII and ACRA claims "are governed by the same standards." *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860 (8th Cir. 2009).

the *McDonnell Douglas* framework. *See Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). The term "direct evidence" "refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Id.* If a plaintiff does not have "strong (direct) evidence that illegal discrimination motivated [an] employer's adverse action," then she must create "the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Id.* (first parenthetical in original). In sex discrimination cases, a plaintiff satisfies the first, "*prima facie*," step of the *McDonnell Douglas* framework by showing that "(1) she was a member of a protected group; (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) she was treated differently from similarly situated males." *Tenge v. Phillips Modern Ag. Co.*, 446 F.3d 903, 910 (8th Cir. 2006). Once a plaintiff makes this *prima facie* case of discrimination, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions, and then shifts back to the employee to show that the employer's reason was pretextual." *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005).

Given the analytical similarities between Orr's Title VII, ADA disparate treatment, and ADA retaliation claims, the Court will discuss them together, beginning with the question of whether she has made out a *prima facie* case of each, and proceeding through the *McDonnell Douglas* framework. Then, the Court will discuss Orr's analytically distinct failure to accommodate claim.

### B. Title VII: Orr Has Made a *Prima Facie* Case of Discrimination

Beginning with Title VII, the Court first finds that Orr has not presented any direct evidence of sex discrimination. Direct evidence "is evidence that establishes a specific

11

link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employment decision." *Shaffer v. Potter*, 499 F.3d 900, 904 (8th Cir. 2007) (alteration and quotation omitted). This includes "evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude, where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor." *Id.* (quotation omitted). In simpler terms, direct evidence "most often comprises remarks by decisionmakers that reflect, without inference, a discriminatory bias." *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861 (8th Cir. 2009); *see also Simmons v. New Pub. Sch. Dist. No. Eight*, 251 F.3d 1210 (8th Cir. 2001) (school board president's statements that plaintiff was "a woman in a man's job" and that a woman "can't handle" plaintiff's job were direct evidence of discrimination), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011); *Stacks v. Sw. Bell Yellow Pages, Inc.*, 27 F.3d 1316 (8th Cir. 1994) (supervisor's statement that "women in sales were the worst thing that had happened to this company" and other similar statements were direct evidence of discrimination).

Orr's supervisors included Vicki Atchley, Michael Johnson, James Baker, and James Allen. (Doc. 35-8, p. 3). She was originally interviewed by Atchley and Johnson regarding her alleged performance issues. (Doc. 23-8, p. 1). Baker then participated in Orr's pre-disciplinary hearing, (Doc. 23-17, p. 4), and recommended her termination to Allen, *id.* at 7, who then made the ultimate decision to terminate her. (Doc. 35-8, pp. 3-5). Orr has not alleged that any of these individuals, or anyone else for that matter, made

any statements indicating that she was terminated because of her gender. Instead, she argues that Atchley's refusal to provide her requested training after she returned to full duty is somehow direct evidence of sex discrimination. (Doc. 37, pp. 6-8). While the Court will discuss this issue further in the context of Orr's ADA claims, it suffices to say that it is not at all evidence of sex discrimination, let alone direct evidence of such.

Orr must therefore prove her sex discrimination claim through the *McDonnell Douglas* framework. It is undisputed that Orr, as a female, is a member of a protected group, and that her termination constitutes an adverse employment action. The City does dispute, however, that Orr was qualified to perform her job, and that she was treated differently from similarly situated males. Regarding the former, the City suggests that Orr's seven disciplinary incidents between March and May of 2014 indicate that she was not qualified to perform her job. *See* Doc. 22, pp. 7-8. But "it is well-established that the threshold of proof necessary to establish a prima facie case is minimal." *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1022 (8th Cir. 1998). Given this minimal burden, Orr's many years of experience and training as a dispatcher and supervisor suffice to show that she was qualified for her position, even in light of her later-incurred infractions.

Orr has also satisfied her burden to show, at the *prima facie* stage, that she was treated differently than similarly situated males. The Eighth Circuit has set a "'low threshold' for employees to be considered similarly situated" at the *prima facie* stage, "requiring only that the employees 'are involved in or accused of the same or similar conduct and are disciplined in different ways.'" *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 851 (8th Cir. 2005) (quoting *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir. 2004)), *abrogated on other grounds by Torgerson*, 643 F.3d at 1031. *Rodgers* itself

13

illustrates just how low this threshold is. Therein, a bank teller raised allegations of race discrimination after she was terminated from her position. *Id.* at 847. The bank terminated the teller after she violated its procedures during nine transactions totaling over $650,000. *Id.* at 851. Her comparator, a senior teller, had violated the same procedure during only a single transaction amounting to $1,200. *Id.* Despite these significant differences, the *Rodgers* Court found that the plaintiff had established a *prima facie* case of race discrimination. *Id.* at 853.

In the instant case, Orr was terminated after violating the City's Police Department's Code of Conduct § 3.1.2, which generally requires employees to "maintain sufficient competency to properly perform their duties in a manner which will maintain the highest standard of efficiency in carrying out the functions and objectives of the Department." (Doc. 23-8, p. 1). As male comparators, Orr lists Jeffrey Smyth, Nathan Heald, Matt Phillips, Douglas Grant, Paul Johnson, and Mark Baughman. (Doc. 37, p. 14). She alleges that all of these employees committed Code of Conduct § 3.1.2 violations and were not terminated. The evidence she puts forth to support these claims indicate that Grant was, in fact, terminated,[3] and that Smyth resigned during his administrative review. (Doc. 35-8, p. 1). Heald, per Orr's deposition, was placed on a 90-day probation and then was allowed to resign or be terminated. (Doc. 23-1, p. 22). Orr could not identify what misconduct the City had accused him of. *Id.* Phillips, who worked under Orr, was reassigned rather than terminated after twice making errors in processing warrants. *Id.* at

---

[3] Orr's deposition, on the other hand, indicates that Grant was allowed to transfer to another department and was not terminated. (Doc. 23-1, p. 26). Regardless, Orr could not identify any details about Grant's misconduct, so he is unhelpful as a comparator either way.

14

24-25. The City allowed Paul Johnson, who also worked under Orr, to undergo remedial training rather than face disciplinary actions after he sent officers responding to a 9-1-1 call to the wrong address. *Id.* at 27.[4] Finally, the Court can deduce from Orr's deposition that Baughman also made an addressing error in processing a 9-1-1 call, but received a lesser punishment than she did. *Id.* at 25.

The Court believes that at least Phillips, Johnson, and Baughman are sufficient male comparators to Orr at the *prima facie* stage. Though Phillips and Johnson held lesser positions than Orr's, and Baughman appeared to hold a position comparable to Orr's only on an interim basis, *id.*, the Court finds that there was enough overlap in their job responsibilities to qualify them as comparators at this stage. Further, though "there are differences in the severity and frequency," the comparators' violations are similar in kind to those allegedly committed by Orr. *Rodgers*, 417 F.3d at 852.

In sum, Orr is a member of a protected class who suffered an adverse employment action. She has further made a *prima facie* showing that she was qualified for her position, and that she was treated differently than similarly situated male employees. Thus, after first discussing Orr's *prima facie* ADA disparate treatment and retaliation claims, the Court will proceed to ask whether the City has offered a legitimate non-discriminatory justification for her termination, and whether she has shown that justification to be pretextual.

---

[4] Orr admits that she has no first-hand knowledge of this incident, (Doc. 23-1, p. 27), but the Court will assume that testimony regarding it would be admissible at trial, for purposes of the instant Motion.

## C. Orr Has Made a *Prima Facie* Case of Disability Discrimination Based on Disparate Treatment

The first question the Court must address in determining whether Orr has made a *prima facie* disparate treatment claim is whether she is "disabled," as defined by the ADA. Under the Act, a plaintiff's impairment will constitute a disability when it creates a "substantial limitation" on "one or more major life activities." 42 U.S.C. § 12102(1)(A). This definition encompasses not only individuals with actual "physical or mental impairment[s]," but also those with "a record of such an impairment," or those "regarded as having such an impairment." 42 U.S.C. § 12102(1). In evaluating whether a plaintiff's impairment constitutes a disability, this Court is mindful that, "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations," not "whether an individual's impairment is a disability under the ADA . . . ." ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 11-325, 122 Stat. 3553, § 2(b)(5). And, the Court further notes that "[t]he definition of disability in [the ADA] shall be construed in favor of broad coverage of individuals under [the] Act, to the maximum extent permitted by the terms of [the] Act." 42 U.S.C. § 12102(4)(A).

Though broad, the ADA's definition of disability is not unlimited. Indeed, EEOC regulations specify that "not every impairment will constitute a disability within the meaning of [the ADA and its regulations]." 29 C.F.R. § 1630.2(j)(1)(ii).[5] Several courts,

---

[5] The City's briefings quote 29 C.F.R. § 1630.2 as stating that "a broken bone that is expected to heal completely[] usually will not substantially limit a major life activity." (Doc. 22, p. 15 (alteration in original)). However, this statement does not actually appear in the regulation. It seems to the Court that the quote originated from a set of regulations *proposed* by the EEOC, but that the provision was deleted prior to final adoption. *See* 1 Disability Law Compliance Manual Appendix A4 (noting that proposed § 1630.2(j)(8), which included the "broken bones" reference, was deleted after commenters found it confusing). A similar phrase appeared in the appendix to 29 C.F.R. § 1630, but was

even after Congress broadened the meaning of disability by enacting the ADAAA, have concluded that broken arms and similar injuries are typically just this sort of impairment. *Clark v. Boyd Tunica, Inc.*, 2016 WL 853529, at *5 (N.D. Miss. Mar. 1, 2016) (broken foot not a disability); *Martinez v. N.Y. State Div. of Human Rights*, 2015 WL 437399, at *8 (S.D.N.Y. Feb. 2, 2015) (temporary injuries from a slip-and-fall did not result in disability under the ADA); *Kruger v. Hamilton Manor Nursing Home*, 10 F. Supp. 3d 385, 389 (W.D.N.Y. 2014) ("Plaintiff's broken arm is not an injury considered a 'disability' under the ADA, and Plaintiff has failed to allege that her injury was more than temporary."); *Bush v. Donahoe*, 964 F. Supp. 2d 401, 421 (W.D. Pa. 2013) (ankle/foot sprain is not a disability); *Zick v. Waterfront Comm'n of N.Y. Harbor*, 2012 WL 4785703, at *5 (S.D.N.Y. Oct. 4, 2012) ("Plaintiff's broken leg is simply not an injury considered a 'disability' under the ADA."); *George v. TJX Cos., Inc.*, 2009 WL 4718840, at *8 (E.D.N.Y. Dec. 9, 2009) (fractured arm is not a disability under the ADA); *see also Bliss v. Morrow Enters., Inc.*, 2011 WL 2555365, at *6 n.2 (D. Minn. June 28, 2011) (expressing doubt that a broken arm was a disability even "under the broader standard adopted by Congress in the [ADAAA]"). On the other hand, some courts have found that, post-ADAAA, comparable temporary impairments do constitute disabilities. *Judge v. Landscape Forms, Inc.*, 2014 WL 12502685 (W.D. Mich. Mar. 6, 2014) (torn bicep constitutes a disability); *Moore v. Jackson Cnty. Bd. of Educ.*, 979 F. Supp. 2d 1251 (N.D. Ala. 2013) (broken ankle constitutes a disability).

---

removed in 2011. *Compare* 29 C.F.R. § 1630, app. § 1630.2(j) (2010), *with* 29 C.F.R. § 1630, app. § 1630.2(j) (2011).

The Court views the question of whether Orr's broken arm constitutes a disability as particularly close. On the one hand, the weight of the post-ADAAA case law indicates that district courts have not treated similar injuries as disabilities. On the other, this Court is obligated to undertake an "individualized assessment" of Orr's impairment, 29 C.F.R. § 1630.2(j)(iv), and not rely solely on the diagnosis or label applied to her injury. *See Matthews v. Pa. Dep't of Corr.*, 613 F. App'x 163, 168 (3d Cir. 2015) ("[W]e must set aside the mild-sounding diagnosis and perform an individualized assessment of the effect of the impairment on the life of [the plaintiff].")." Orr originally broke her arm in February of 2013. Because the break did not heal correctly, her doctor recommended corrective surgery in September of that year, and she did not fully recover until the early part of 2014. Thus, Orr's impairment lasted for approximately a year. During this time, Orr was either out of work or on "light duty," which relegated her to performing administrative tasks. (Doc. 23-1, pp. 18-19). Orr's deposition testimony establishes that she could not "process emergency phone calls . . . because [she] did not have the use of [her] left arm and [she's] left-handed." *Id.* at 20. Given the broad interpretation the Court must apply to the ADA's definition of "disability," the Court finds that a reasonable jury could conclude that Orr's broken arm constituted a disability because it substantially limited her major life activity of working.[6] *See* 29 C.F.R. § 1630.2(i)(1)(i) (listing "working" as a major life activity). She has, accordingly, satisfied the first prong of her *prima facie* case.

---

[6] The Court believes that, typically, broken limbs will not constitute disabilities under the ADA. It is only the unique circumstances of Orr's injury—that it required corrective surgery, impairing her ability to work for a full year—that render it a disability under the Act. Even so, the Court views this as a borderline case, just barely falling within the ADA's protections.

Next, Orr must show that she was a "qualified individual" under the ADA. To be a qualified individual, a plaintiff must "(1) possess the requisite skill, education, experience, and training for her position; and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Heaser v. Toro Co.*, 247 F.3d 826, 830 (8th Cir. 2001), *abrogated on other grounds by Torgerson*, 643 F.3d at 1031. Just as it did in the Title VII context, the City contends that Orr is not a qualified individual because her disciplinary record indicates that she could not perform the essential functions of her job. As was also discussed in the Title VII context, Orr had significant experience and training as a dispatcher and supervisor, and had performed in those positions apparently without incident for most of her career. Because the evidentiary burden on the plaintiff is quite low at the *prima facie* stage, *Young*, 152 F.3d at 1022, this work history suffices to show that she was qualified for her position.

Finally, to establish her *prima facie* case of disability discrimination based on disparate treatment, Orr must show that she was terminated *because of* her disability. As noted above, the Eighth Circuit has set a "'low threshold' for employees to be considered similarly situated" at the *prima facie* stage. *Rodgers*, 417 F.3d at 851, *abrogated on other grounds by Torgerson*, 643 F.3d at 1031. Supplementing the aforementioned male comparators offered by Orr in the Title VII context, she adds Donna Carrell, Kelly O'Connell, Beverly Luper, Kelly Latham, Lori Borchardt, and Autumn Pianalto as non-disabled comparators. While the Court will discuss these comparators more in the pretext stage, the male comparators offered by Orr in the Title VII context (and offered again in the ADA context) are alone sufficient to make a *prima facie* showing that the City

terminated Orr because of her disability. This is so for the same reasons articulated *supra*, at 14-15.

Orr has, in short, shown that she was a disabled qualified individual, as defined by the ADA. She has also shown, at this *prima facie* stage, that the City terminated her because of her disability. Accordingly, Orr has made a *prima facie* case of disparate treatment disability discrimination.

### D. Orr Has Made a *Prima Facie* Case of Disability Discrimination Based on Retaliation

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). To establish a *prima facie* case of discrimination based on this retaliation provision, Orr must show that she engaged in an activity protected by the ADA, that the City took an adverse employment action against her, and that there was a causal connection between her protected activity and the adverse action. *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013). The Eighth Circuit has held that 42 U.S.C. § 12203(a)'s protections extend to "a person who is terminated after unsuccessfully seeking an accommodation . . . if she had a good faith belief that the requested accommodation was appropriate." *Hill*, 737 F.3d at 1218.[7]

---

[7] *Hill* also notes that the Eighth Circuit has "recognized a cause of action for retaliation under the Rehabilitation Act, although the textual basis for the claim is not well explained in our cases." 737 F.3d at 1218.

The Court finds no basis to doubt that Orr held a good faith belief that her requested accommodation was appropriate, at least when viewing the facts in the light most favorable to her. That request therefore satisfies the first element of her *prima facie* case. There is also no question that the City took an adverse employment action against her by terminating her employment. *E.g.*, *Hill v. Walker*, 918 F. Supp. 2d 819, 828 (E.D. Ark. 2013) (noting that termination "undoubtedly constitutes an adverse employment action").

The only question remaining, then, is whether Orr has shown a causal connection between the two events. Given Orr's minimal burden of proof at this *prima facie* stage, the Court finds her comparator evidence sufficient to show causation for the same reasons it approved of this evidence in the Title VII and disparate treatment contexts. *See* Sections III(B), III(C), *supra*. The Court also believes Orr's declaration that she "continued to request additional training right up until the point where the City of Rogers fired [her] in May 2014" is relevant evidence of causation. (Doc. 32-5, ¶ 15). While temporal proximity alone is often not enough to establish causation at the *prima facie* stage, *see Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832-33 (8th Cir. 2002) (listing cases and distinguishing between those with temporal proximities of a "matter of weeks" from those involving longer durations), where the temporal proximity is very close, it may be sufficient. *Id.* at 833 (finding a time span of two weeks between a protected activity and a termination to be sufficient, alone, to establish causation at the *prima facie* stage). Given that Orr has presented comparator evidence in addition to showing close temporal proximity, the Court finds that she has satisfied the causation element of her *prima facie* case, and thus, has now established a *prima facie* case of retaliation.

**D. The City Has Articulated a Non-Discriminatory Justification for Terminating Orr**

Having completed analysis on the *prima facie* stage of the *McDonnell Douglas* framework, the Court must now determine whether the City has offered a non-discriminatory justification for terminating Orr. This is so regarding her Title VII, ADA disparate treatment, and ADA retaliation claims; accordingly, the analysis in this Section applies to all three claims.

The City has offered seven work infractions, committed in the span of approximately two months, as justification for terminating Orr. *See supra,* pp. 2-3; *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006) ("We have consistently held that violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee."). Orr argues, however, that the Court cannot consider this justification because her work infractions are "so inextricably related" to her requested accommodation of additional training that "they cannot be considered independently of one another." *Womack v. Munson*, 619 F.2d 1292, 1297 (8th Cir. 1980). To support this argument, Orr relies on *Womack* and the case of *Gilooly v. Missouri Department of Health & Senior Services*, 421 F.3d 734 (8th Cir. 2005). While the Court finds those cases to be somewhat analogous, they are sufficiently distinguishable to not apply in full force to the instant case.

The plaintiff in *Womack* had spent many years working in a county sheriff's department before being discharged in 1973. 619 F.2d at 1294. Following his discharge, Womack filed a complaint with the EEOC. *Id.* In 1975, the state prosecutor's office hired him as an investigator, and shortly thereafter he filed a class action suit against his former employer based on his EEOC charge. *Id.* Womack's new supervisor, state prosecutor

22

Lee Munson, questioned him about the lawsuit two days after it was filed, concerned that it may create conflict of interest issues. *Id.* at 1295. During this meeting, Womack was questioned about an allegation made in his lawsuit against the sheriff's office concerning abuse of suspects by the sheriff's office, and the role black officers were forced to play in interrogating black suspects. *Id.* The prosecutor's office commenced an investigation into Womack's claims, and failed to find any evidence to corroborate the claim in his underlying lawsuit that black deputies had been forced to abuse black suspects. *Id.* Therefore, they concluded, Womack either lied about abusing suspects, or did in fact abuse suspects. *Id.* Either situation required terminating him, according to Munson. *Id.* Womack was promptly fired, and filed a Title VII retaliation suit against the prosecutor's office. *Id.* at 1295-96.

The Eighth Circuit held that "the district court erred in concluding Munson's reason for discharge was a legitimate and nonretaliatory one," and found that "Womack met his burden of showing he was discharged because of the lawsuit he filed against the sheriff." *Id.* at 1296. Specifically, the *Womack* Court believed the district court erred in crediting Munson's non-discriminatory justification because "the admission and denial of abuse by Womack are so inextricably related to the allegation in [his complaint against the sheriff's office] that they cannot be considered independently of one another." *Id.* at 1297. The court explained further:

> The sole inference the evidence allows here is that Womack's discharge would not have taken place in the absence of the lawsuit he filed against the sheriff. He was initially questioned only because he filed the lawsuit. His admission and denial were responses to employer questions on an allegation he made in the lawsuit: discriminatory, abusive practices by the sheriff's office. They were answers to questions on his personal knowledge of the substance of his allegation. As such, they are virtually inextricable from his protected charge. For purposes of determining the nature and

extent of protected activity under section 704(a) [of Title VII], **they are inseparable from the court complaint that is clearly protected by statute. They therefore share the complaint's protected status, and cannot constitute independent, legitimate reasons for discharge.**

*Id.* (emphasis added).

The situation in *Gilooly* was similar. Gilooly, an employee of the Missouri Department of Health and Human Services ("MDHHS"), had alleged that two of his coworkers were sexually harassing him. 421 F.3d at 736. After he was suspended for five days, supposedly on an unrelated matter, he alleged that his suspension constituted Title VII retaliation. *Id.* at 737. When a subsequent investigation failed to support Gilooly's allegation, he was fired. His termination letter stated that "the reason for Gilooly's dismissal was that he made false statements during the investigation and grievance hearing which followed his accusations against two former co-workers," and then identified several areas in which he supposedly deceived investigators. *Id.* (alterations removed).

Gilooly filed suit in federal court, alleging in relevant part that his termination was in retaliation for his sexual harassment allegations. The Eighth Circuit applied *Womack* and found that the MDHHS's nondiscriminatory justification—that Gilooly lied during the investigation—was insufficient. *Id.* at 740-41. This was so for two reasons: First, because the statements made by Gilooly during the course of the investigation into his underlying sexual harassment claims were not sufficiently independent from his underlying protected activity—filing the sexual harassment claim. *Id.* at 740. Second, because the question of whether his statements were in fact false boiled down to a witness credibility determination, best left for the jury. *Id.* at 741.

Two principles can be extracted from these cases. The first, a narrow proposition, is that statements made by employees during the course of investigations into their discrimination complaints cannot be used as justification for later terminating them, at least not unless those statements are indisputably false. The second, a somewhat broader proposition, is that Courts should be wary of supposedly nondiscriminatory justifications that bear a close relationship to the employee's underlying protected conduct.

In Orr's case, the nondiscriminatory justification offered by the City is that she committed seven work infractions over the span of two months, shortly after she returned to full duty from her broken arm. Orr contends that this justification is closely tied to her protected conduct—requesting additional training as an accommodation for her broken arm—because she would not have committed the infractions had she received the training. The Court first observes that Orr's protected conduct and the City's justification are not as closely related as the justifications and protected conduct in *Womack* and *Gilooly*. In those cases, the employers' justifications were tantamount to simply not believing the employees' statements about their underlying discrimination allegations. By analogy, it would be as if the City's non-discriminatory justification for terminating Orr was that they thought she was lying about needing additional training. There is an attenuation between a request for training and a subsequent series of infractions that does not exist between an employee's statements about his protected conduct and the protected conduct itself. The justification, in Orr's case, is not one-and-the-same as the protected conduct itself, such that the relationship between the two undermines the validity of the justification.

25

Next, the Court finds no causal link between the training requested by Orr and most of the violations offered by the City to justify her termination. Orr's training request pertained to software updates and unwritten protocols that had changed during her year away from dispatch. At best, the record establishes that two of Orr's seven violations may have fallen within the scope of this requested training; namely, the May 1 and May 9 incidents, which involved inputting addresses into computer software. The other five violations pertained to the general requirements of being a dispatch supervisor, such as properly interrogating callers, logging information from the calls, and supervising dispatchers. Because Orr's request for training did not pertain to much of the subject matter for which she was later terminated, the *Womack* / *Gilooly* concern about having a close tether between an employee's protected conduct and an employer's justification for termination is greatly diminished, if not entirely absent, in this case. For these reasons, the Court finds that the City has offered a non-discriminatory justification for terminating Orr.

### E. Orr Has Not Shown That the City's Justification is Pretext

At this final step in the *McDonnell Douglas* framework, Orr must show that the City's justification is pretext. "Where the evidence used to establish a prima facie case meets [a] minimal burden but is not strong, that evidence, standing alone, may be insufficient to sustain the plaintiff's case at the final stage of the burden-shifting analysis." *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007). This is so in part because "the level of proof required to show causation is less at the prima facie stage than at the final stage of the *McDonnell Douglas* analysis." *Id.* With this higher burden in mind, the several theories offered by Orr in her attempt to prove pretext all miss the mark.

First, Orr suggests—as she did at the *prima facie* stage—that the City treated her less favorably than similarly situated employees. Unlike at the *prima facie* stage, "[a]t the pretext stage of the *McDonnell Douglas* burden-shifting framework, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Cody v. Prairie Ethanol, LLC*, 763 F.3d 992, 998 (8th Cir. 2014) (quotation omitted). The plaintiff "has the burden to prove that [she] and the other employee[s] were similarly situated in all relevant respects, including that the offenses were of the same or comparable seriousness." *Id.* More specifically, to be similarly situated, the comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012) (quotation omitted).

The comparators offered by Orr are not even remotely similarly situated to her under this standard. Orr's brief lists eleven comparators: Jeffrey Smyth, Nathan Heald, Matt Phillips, Douglas Grant, Donna Carrell, Kelly O'Connell, Beverly Luper, Paul Johnson, Mark Baughman, Kelly Latham, Lori Borchardt, and Autumn Pianalto. These employees, Orr suggests, violated the same policy as she did, but were not terminated as a result. Of these comparators, only Luper appears to have had the same immediate supervisor as Orr. (Doc. 35-8, p. 8). Jeffrey Smyth, Lori Borchardt, Autumn Pianalto, Matt Phillips, Doug Grant, and Paul Johnson were all dispatchers without any apparent supervisory responsibilities. (Doc. 23-1, pp. 12-13, 23, 26, 28). Nathan Heald was a dispatch coordinator, which put him in a supervisory capacity over Orr. *Id.* at 22 (explaining that Heald previously held the same position as Vicki Atchley, who was Orr's supervisor at the time of her termination). Kelly Latham was a training coordinator. *Id.* at

27

46. The positions of the other individuals listed above, and the extent to which they are comparable to Orr's, are unclear.

Perhaps more importantly, though, is that Orr has failed to establish that her supposed comparators engaged in "the same conduct" as her "without any mitigating or distinguishing circumstances." *Bone*, 686 F.3d at 956 (quotation omitted). The City's disciplinary records merely establish that some of the aforementioned employees generally violated the City's "Code of Conduct (3.1.2) Competency," (Doc. 35-8), as Orr did, but do not specify how they violated that policy. Orr's deposition testimony, moreover, only alleges that some of the comparators committed one or two infractions—not *seven* over a short time span. *See* Doc. 23-1, p. 12 (Pianalto made one error involving an addressing issue); *id.* at 22 (unable to identify Heald's specific work problems); *id.* at 24 (Smyth made an error processing a warrant on two occasions); *id.* at 26 (unable to identify Grant's specific work problems); *id.* at 27 (Johnson sent officers to the wrong address once). The one employee who Orr alleges made several mistakes, Jeffrey Smyth, *id.* at 23, was a dispatcher without supervisory responsibilities, and thus not at all comparable to Orr, *id.* at 12.

A second tack taken by Orr is to dispute the significance and validity of her seven workplace infractions. In her deposition testimony, Orr did not deny the occurrence of the incidents that the City used to justify her termination. Instead, she disputed their categorization as improper, argued they were excused for one reason or another, or suggested that they were not terminable offenses. *See generally* Doc. 23-1. Her Response Brief echoes these sentiments in several respects. *See* Doc. 37, pp. 16-17. In this sense, Orr's arguments are materially similar to the plaintiff's in *Torlowei v. Target*,

401 F.3d 933 (8th Cir. 2005). There, the plaintiff's "briefs focus[ed] mostly on arguments that [the defendant] should have provided better training, . . . that it should have utilized a better computer system, [and] that termination [was] too harsh a result" for the plaintiff's infraction. *Id.* at 935 n.1. Accepting these arguments would have led the *Torlowei* Court to "decide [the] case on the basis of fairness, not evidence of . . . discrimination." *Id.* at 935. Like the *Torlowei* Court, this Court will not "sit as a super-personnel department that reexamines an entity's business decisions." *Id.* In the absence of sufficient evidence that the City terminated Orr because of her disability or because of her gender, the Court will not second-guess the City's evaluation of the validity or seriousness of Orr's offenses.

Orr's final argument regarding pretext worth discussing is the timing of her termination. She argues that the proximity of her requests for training, as an accommodation for her broken arm, to her termination shows pretext. It does not. The Court, as an initial note, cannot see how the timing between the two would have any bearing in the Title VII sex discrimination context. As to disability discrimination and retaliation, in most cases at the pretext stage, "timing on its own is not sufficient to show that an employer's non-discriminatory or non-retaliatory reason for an adverse employment action is merely pretext." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) (quotation omitted and alterations removed). This is so because "in deciding whether a plaintiff has presented sufficient evidence to demonstrate pretext or retaliation, we evaluate the timing of an adverse action 'in light of other evidence, or lack of other evidence, in the record.'" *Id.* (quoting *Sherman v. Runyon*, 235 F.3d 406, 410 (8th Cir. 2000). "Put another way, an employee's attempt to prove pretext requires more substantial evidence than it takes to make a prima facie case, because unlike evidence

29

establishing a prima facie case, evidence of pretext . . . is viewed in light of the employer's justification." *Id.* (quotation omitted and alterations removed). Viewed in this light, the timing of Orr's termination was close in proximity to her seven workplace infractions, not just her request for accommodation. *See Hill v. Walker*, 737 F.3d 1209, 1219 (8th Cir. 2013) ("Especially where the employer's proffered reason for action is virtually contemporaneous with the protected activity, we are disinclined to declare a genuine issue of fact for trial based on temporal proximity alone.") The timing, then, does little to suggest that the City fired Orr because of her disability, or request for accommodation, and not because of her multiple infractions.

In short, Orr cannot carry her burden on the last step of the *McDonnell Douglas* analysis. The City's Motion for Summary Judgment will therefore be **GRANTED** as to Orr's Title VII claim, ADA disparate treatment and retaliation claims, and related ACRA and Rehabilitation Act claims. This leaves only Orr's ADA (and related ACRA and Rehabilitation Act) failure to accommodate claim.

### F. Orr's Failure to Accommodate Claim Survives Summary Judgment, but She Cannot Recover Damages Related to Her Termination

To briefly recount the applicable legal standard for failure-to-accommodate claims, the Eighth Circuit applies "a modified burden-shifting analysis," *Fenney v. Dakota, Minn. & Eastern R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003), in which a plaintiff first "must establish both a prima facie case of discrimination based on disability and a failure to accommodate it," *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015). The plaintiff has the burden to show that the requested accommodation is reasonable, and then the employer must show undue hardship. *See Peebles v. Potter*, 354 F.3d 761, 768 (8th Cir. 2004). The Eighth Circuit has also recognized that an

employer's failure to engage an employee in the so-called "interactive process" for finding an accommodation may itself be grounds for denying summary judgment to the employer. *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 952 (8th Cir. 1999).

Two features of the case at bar make determining the proper application of this legal standard somewhat challenging. First, the accommodation sought in this case is extremely atypical of failure to accommodate cases. Typically, in such cases, the plaintiff will have an *existing disability* that prevents her from fulfilling her normal work duties without some accommodation. For example, an employee whose disability limits her typing ability may request speech-to-text software. *Picard v. St. Tammany Par. Hosp.*, 611 F. Supp. 2d 608 (E.D. La. 2009). Or, a plaintiff whose disability affects his ability to sleep may request a flexible work schedule as an accommodation. *Foster v. Time Warner Entm't Co., L.P.*, 250 F.3d 1189 (8th Cir. 2001). During the time that Orr had an existing disability, it is undisputed that the City provided her with accommodation. *See* Doc. 23-1, pp. 18-20 (discussing Orr being assigned to administrative duties because she was "not able to process emergency phone calls with a keyboard").

It is instead the period of time shortly after Orr's disability ended that gives rise to her failure-to-accommodate claim. As she returned from her "light work" administrative duties to her normal duties—which included dispatching work that she had not performed in about a year—Orr requested training on certain specific issues as an accommodation. *See* Doc. 35-2, ¶¶ 6, 10-15.  She alleges that the City failed to provide her with that training.

While the Court has little case law to draw from,[8] it ultimately finds that a jury could conclude that Orr's requested accommodation was reasonable. The ADA specifies that a reasonable accommodation may include the "appropriate adjustment or modifications" of "training materials or policies." 42 U.S.C. § 12111(9). The implementing regulations to the ADA, further, contemplate that an individual with a *past* disability "may be entitled . . . to a reasonable accommodation if needed and related to the past disability." 29 C.F.R. § 1630.2(k) (offering, as an example, allowing a formerly disabled employee a schedule change to allow him to attend follow-up or monitoring appointments with his healthcare provider). Thus, there is nothing *per se* unreasonable about a formerly disabled employee requesting additional training upon return to her regular work duties.[9]

---

[8] The Court located two accommodation cases involving a request for training following a disability-related absence. Neither of the cases, however, address the reasonability of the request. *See Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16 (2d Cir. 2015) (finding that a failure to provide training after plaintiff returned from disability leave did not violate the ADA because the plaintiff never requested training); *Howard v. U.S. Steel Corp.*, 2014 WL 1042968, at *2 (N.D. Ala. Mar. 14, 2014) (finding that failure to provide training for former position after return from disability leave did not violate the ADA because the employer's provision of training for a different position was reasonable).

[9] The City relies on *Wood v. Crown Redi-Mix, Inc.*, 339 F.3d 682 (8th Cir. 2003), for the proposition that Orr's claim fails because her request for accommodation is not related to her disability. This argument extends *Wood* beyond its logical bounds. In that case, the plaintiff's disability limited his ability to procreate. *Id.* at 687. His request for accommodation, however, had nothing to do with his inability to procreate, and instead related to other injuries that the Court found did not render him disabled. *Id.* Given this lack of causal relationship between the limitation and the requested accommodation, the plaintiff's claim failed. *Id.* In the instant case, however, Orr's requested accommodation *is* causally related to her limitation. As the Court has explained, her limitation prevented her from working as a dispatcher for one year. Her requested accommodation, viewed in the light best to her, pertained to training on changes in software and protocol that occurred during that year—i.e. during the time she was unable to work as a dispatcher due to her limitation. Given this causal relationship, the principle recited in *Wood* is inapposite to the case at bar.

Moreover, the Court finds that the particulars of Orr's request provide additional grounds for finding it to be reasonable. Viewing the facts in the light most favorable to Orr, she requested training on software and protocol changes that occurred while she was out of work or assigned to light duty. Obtaining additional training on these specific matters could "provide the disabled individual an *equal* employment opportunity, including an opportunity to attain the *same* level of performance . . . that is available to similarly situated employees who are not disabled." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (emphases added). The Court would be less likely to find a broader training request—such as a request for "A to Z" retraining—to be reasonable in cases like this one, where the employee is an experienced supervisor who was absent for only one year.

The second unique feature of this case is that, as the Court found in Section III(D), *supra*, there is no causal connection between the City's failure to accommodate Orr and its decision to terminate her: Orr's workplace infractions that were unrelated to the subject matter of her requested training were sufficient grounds for her termination. This raises the interesting question of whether a plaintiff asserting a failure to accommodate claim needs to show that she suffered an adverse employment action because of her employer's failure to accommodate her disability. At least one circuit court case has suggested that a plaintiff must make this showing. *See Foster v. Arthur Andersen, LLP*, 168 F.3d 1029 (7th Cir. 1999) (including, as an element of a failure to accommodate claim, "the disability caused the adverse employment action"). *Foster*, it is fair to say, has become somewhat of a disfavored case for this reason, but the cases distinguishing it have done so in a manner that leaves *Foster* still analogous to the instant case. *See*

*Nawrot v. CPC Intern.*, 259 F. Supp. 2d 716 (N.D. Ill. 2003); *Nichols v. Unison Indus., Inc.*, 2001 WL 849528 (N.D. Ill. 2001) (both describing *Foster* as involving a failure to accommodate claim resting on the theory that, had the company accommodated the plaintiff's disability, she would not have violated company procedures). Courts have, more broadly, disagreed about whether a failure-to-accommodate plaintiff needs to show an adverse employment action at all. *Compare, e.g.*, *E.E.O.C. v. AutoZone, Inc.*, 630 F.3d 635, 638 n.1 (7th Cir. 2010) ("No adverse employment action is required to prove a failure to accommodate."), *with Fenney*, 327 F.3d at 712 (stating that a failure-to-accommodate plaintiff must "make a facial showing that he has an ADA disability and that he has suffered adverse employment action"); *see also, generally,* Megan I. Brennan, *Need I Prove More: Why an Adverse Employment Action Prong Has No Place in a Failure to Accommodate Disability Claim*, 36 Hamline L. Rev. 497 (2013) (summarizing the disagreement in the case law and concluding that a plaintiff should not have to show an adverse employment action). And, adding some complexity to this dispute, the Eighth Circuit has declared that a failure to accommodate can itself be an adverse employment action. *See Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1060 (8th Cir. 2016) ("An employer is . . . liable for committing an adverse employment action if the employee in need of assistance actually requested but was denied a reasonable accommodation."); *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1077 (8th Cir. 2006) ("Because the alleged failure to accommodate is the adverse action and no other act is claimed as discriminatory, *there is no requirement to demonstrate any adverse action other than the failure to accommodate itself.*" (emphasis added)).

While this diversity of description creates some uncertainty in the state of the law, the Court is confident that Orr need not show that her employer's failure to accommodate her request caused her termination. To begin, the Eighth Circuit's repeated statement that a failure to accommodate can itself be an adverse employment action makes mincemeat of the concept that a plaintiff must show a causal relation between the two. Next, the ADA refers to a failure to accommodate as being a form of discrimination in and of itself, 42 U.S.C. § 12112(b)(5)(A), and the Eighth Circuit has referred to an employer's obligation to accommodate its employees' disabilities in the same way. *Peebles*, 354 F.3d at 767 ("In a reasonable accommodation case, the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations."). Thus, the Court believes a plaintiff can seek damages for the failure to accommodate *itself*, without having to rely on damages incurred via another allegedly discriminatory act, such as termination. At the least, an employer who fails to accommodate an employee may be liable for nominal damages, in the event the employee cannot prove compensatory damages. *E.g.*, *Wheeler v. Tinsman*, 2014 WL 1053738, at *3 (W.D. Ark. Mar. 18, 2014) (noting the possibility of nominal damages in an ADA case);[10] *Kearney v. Fischer*, 609 F. App'x 673, 676 (2d Cir.) (affirming jury's award of nominal damages in an ADA case) *cert. denied*, 136 S. Ct. 181 (2015).

Having concluded that Orr's request for accommodation was reasonable, and that her claim can proceed despite the lack of causation between the City's alleged failure to accommodate and her termination, the Court has little difficulty in further concluding that

---

[10] The Hon. P.K. Holmes III.

Orr's failure to accommodate claim survives summary judgment. Viewing the facts in the light most favorable to Orr, she has established a *prima facie* failure-to-accommodate claim. The City, in response, has not offered any explanation as to why it did not provide her with the training she requested.[11] Moreover, the Court finds questions of material fact about whether the City engaged in the "interactive process" with Orr.

As explained in *Product Fabricators*, "[i]n order to determine whether an accommodation is necessary, and if so, what that accommodation may be, the employer and employee must engage in the 'interactive process.'" 763 F.3d at 971 (quoting *Peyton v. Fred's Stores of Ark., Inc.*, 561 F.3d 900, 903 (8th Cir. 2009)). To show that an employer failed to participate in the interactive process, the employee must show:

> 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Id.* (quoting 561 F.3d at 902).

There can be little doubt that Orr has satisfied the first two factors. The City at no point disputes that it was unaware of Orr's broken arm; indeed, it provided her with accommodations throughout the year that she was recovering from her injury. Regarding the second element, Orr testified that she requested additional training several times after returning from light duty. (Doc. 35-2). Her supervisor, Vicki Atchley, who the City hired shortly after Orr returned to full duty, has testified that she was unaware that Orr was ever even on light duty. (Doc. 44-2, ¶ 1). This possibly conflicting testimony creates a fact

---

[11] The City's inability to provide an explanation on this point is likely related to its position that Orr never actually requested the accommodation. But that is a fact issue that must be decided by a jury.

question for the jury about whether Orr requested additional training, and if so, whether she requested it *because of* her disability. Third, issues of fact exist over whether the City made a good faith effort to assist Orr in seeking accommodations. The City has offered training records showing that Orr attended two training sessions in early 2014, after she returned to full duty. (Doc. 23-7). One is titled "Terminal Operations Level II Refresher," and the other is titled "Bi-Monthly Fire Training Meeting." *Id.* Orr, however, refers to these sessions as "generic trainings that did not cover the specific software" used by the dispatchers, and "did not cover the policies or procedures for emergency services dispatch peculiar to the City of Rogers." (Doc. 35-2, ¶ 14). Viewed in the light most favorable to Orr, her requests for training on the issues for which she became deficient by being on light duty were denied or ignored, and instead were met with opportunities for training entirely unrelated to those issues. Finally, issues of fact exist over whether the City could have reasonably accommodated Orr, had they engaged in the interactive process with her. The City employs a training coordinator, (Doc. 23-1, p. 13), and the City has not offered any explanation as to why Orr's request for training could not be fulfilled.

In sum, Orr's failure to accommodate claim survives summary judgment. However, the Court finds that the City's failure to accommodate Orr bears no causal relationship to its decision to terminate her. This is so because most of the incidents for which Orr was terminated do not relate to the subject matter of her requested training. Therefore, Orr cannot use her failure to accommodate claim to recover damages related to her termination. The claim persists though, because a failure to accommodate is, in and of itself, a form of discrimination under the ADA.

## IV. CONCLUSION

For the reasons stated herein, the City of Rogers' Motion for Summary Judgment (Doc. 21) is **GRANTED IN PART AND DENIED IN PART**. The Motion is **DENIED** as to Orr's failure to accommodate claim. The Motion is **GRANTED** as to all of Orr's other claims.

**IT IS SO ORDERED** on this 3rd day of February, 2017.


 _/s/Timothy L. Brooks_
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE